Filed 7/8/15  P. v. Watson CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>MICHAEL ANTHONY WATSON,<br><br>        Defendant and Appellant. | A140044<br><br>(Contra Costa County<br>Super. Ct. No. 51221811) |

A jury convicted defendant Watson of four counts of lewd acts against Jane Doe I (hereafter Jane).  (Pen. Code, § 288, subd. (a).)[1]  At trial, she testified about three counts she clearly remembered.  However, a year earlier, on the day the lewd acts occurred, she told her school counselor and police about four counts.  Her statements to them were admitted as prior inconsistent statements and substantive evidence.  On appeal, defendant argues the evidence is insufficient to sustain the conviction on the fourth count.  He also contends consecutive sentencing on the four counts was error.  We affirm.

**STATEMENT OF THE CASE**

A second amended information charged defendant with four counts of lewd acts upon Jane, a child under 14, on August 15, 2012.  (§ 288, subd. (a).)  Count four included a "One Strike" allegation that the offense had been committed during a first degree burglary.  (§ 667.61, subd. (d).)  A fifth count charged defendant with annoying or molesting Jane, a child under 18, with a prior conviction for annoying or molesting a

---

[1]  Unless otherwise indicated, all further statutory references are to the Penal Code.

child. (§ 647.6, subd. (c)(1).)  A sixth count charged defendant with indecent exposure with a prior conviction for indecent exposure.  (§ 314, subd. 1.)

In addition, the information alleged 13 prior felony convictions between 1980 and 2010.  Eight prior convictions were alleged to be serious felonies under the "Three Strikes" law. (§§ 667, subd. (b)–(i)/1170.12)  Three prior convictions were alleged to be violent felonies. (§ 667.5, subd. (a).)  Two were alleged to be prior prison terms. (§ 667.5, subd. (b).)  Three were alleged to be serious felonies.  (§ 667, subd. (a)(1).)

A jury convicted defendant of all charges on August 22, 2013.  At a bifurcated court trial on the prior conviction allegations, the court granted the prosecutor's motion to dismiss several of the allegations.  The court found the remaining allegations true.  The court sentenced defendant to state prison for 14 years consecutive to 150 years to life. Defendant timely appeals.

## STATEMENT OF THE FACTS[2]

### A. Jane's Trial Testimony

In January 2012, Jane moved from Pittsburg with her brother, sister and grandmother to a small, two-bedroom apartment in Richmond.  Her sister moved out in April or May, just before Jane's 13th birthday in June 2012. Jane and her grandmother shared one bedroom and her brother had the other bedroom.  Defendant is Jane's uncle. He visited the apartment on a weekly basis.

In Spring 2012, defendant exposed his private parts to her during multiple car rides.  He also started hugging her low on her waist when no one else was around.

The night before school started on August 15, 2012, Jane fell asleep on the couch. About 10 minutes after her grandmother woke her up on August 15, defendant showed up.  When he arrived, she was in the room she shared with her grandmother getting ready for school.  Jane heard him greet her grandmother, then he came into the bedroom and hugged Jane, face to face, with his hands on her bottom for about 15 seconds.  He "kind

---

[2] Because defendant's appellate contentions involve only counts one through four, we will not summarize the evidence adduced on counts five and six, except as relevant to those four counts.

of moved" when he hugged her.  Then defendant walked out of the room.  She finished getting ready for school.

A little while later, while Jane was putting on her socks, defendant reentered the bedroom and gave her another hug.  This one was like the first, with his hands on her bottom, and lasted about the same amount of time, but defendant moved his hips against Jane more, and she could feel his "sexual parts."  Then defendant let go and immediately left the bedroom.

Jane put on her shoes and coat and went into the kitchen. Defendant was in the kitchen making breakfast, and her grandmother was across from the kitchen on the computer.  Jane went back into the bedroom to straighten it up and get her school bag. After about three minutes, defendant reentered the bedroom and hugged Jane again, but this time he gripped Jane's bottom more tightly, and he moved his hips a lot more.  Jane could feel defendant's private parts. She described how they felt to the police as "stick-like" and she was being truthful when she said this.  This hug lasted about 30 seconds. Then defendant walked away.

About a minute later, defendant asked Jane if she wanted a ride to school.  Jane felt uncomfortable and declined the offer; she walked to school by herself.  During her first class she felt something was not right and "it felt weird"; she decided to talk to Ms. Ryan, the health teacher, whom she trusted.  At the end of class when everyone had left she asked Ms. Ryan, "What do you do when you feel uncomfortable at home?" Ms. Ryan told her to go talk to Ms. Santiago, the school psychologist.  Jane did speak with Ms. Santiago, and after that a police officer came.  She told the police about the car rides and what had happened to her earlier that morning.

Jane testified she remembered getting three weird hugs from defendant that morning, but she also remembered describing four to the police.  To the best of her recollection, as she was testifying, she could not remember if there were three or four hugs, but she knew for a fact there were three. When she spoke to the officer, she was being as truthful as she could be.

**B. Jane's Statement to Emily Santiago**

Emily Santiago, a school psychologist for the West Contra Costa County Unified School District, was the case manager of mental health services at Helms Middle School, and spoke with Jane on the morning of August 15, 2012. Jane was neatly dressed, poised, and mature. Hesitant at first, she eventually described the events of earlier that morning calmly and clearly. Santiago did not testify about the substance of Jane's statements to her.

**C. Jane's Oral and Written Statements to the Police**

On August 15, 2012, San Pablo police officer Katie Casalnuovo was working as a school resource officer at Helms Middle School, where she interviewed Jane and took a written statement from her that day. Jane told Officer Casalnuovo defendant hugged her four separate times that morning.[3] In the written statement, Jane also disclosed four separate hugs.

In the recorded statement, Jane said she lived with her grandmother and brother. She slept on the couch the night before. Her grandmother woke her up to get ready for school. She was getting her clothes and was about to go into the bathroom when her uncle arrived. She went into the bathroom to get ready, then into her room to put on her socks and shoes. Defendant came in and hugged her. It was not a "a regular relative hug." He hugged her on the butt and then let go. He walked away. She put on her socks and was going to get her shoes when he hugged her "on the other side of the bedroom." She put on her shoes and went into her brother's room. Defendant went into the bathroom. She went to get her coat, and when she put it on, "he came out and he hugged me again." She went back into her room. She put on her shoes and got her backpack. Defendant hugged her again, this time moving his hips in a thrusting motion. This was in her grandmother's bedroom. During this hug she noticed something that felt stick-like. She felt his penis. He walked out of the room and started cooking breakfast. She sat

---

[3] Jane's recorded statement was played for the jury and a transcript of it was admitted into evidence.

4

down next to her grandmother. When she went back into the bedroom to get a notebook she had left there, he followed her and asked if she wanted a ride. She said no, she would walk. He stayed around for a while longer and finally left. She went to school after he left.

Jane also said in May and June when defendant gave her rides in the car he would have his pants undone so that his penis was exposed.

After the interview, Officer Casalnuovo asked Jane to write a statement describing what happened that morning with defendant. Jane wrote: "I slept on the couch that morning. My Grandmother told me to get up for school. My uncle had just walked in the door & he hugged my Grandma. I went into the room & got my clothes went to the bathroom. I came out and made my way to put my socks on that's when my uncle came in & hugged me (face to face) he grabbed my butt. I was too nervous to say anything then I went to put my shoes on he came & hugged me again & then I went to get my jacket when I came out my brother's room & went to my Grandmas room he hugged me again & let go. I went to sit by my Grandma. I forgot my backpack & went back I [grabbed] it thats when he hugged me then he grinded/thrusted with his hips then at 7:00 he waited for 7:30 to come he offered me a ride but I said '[I'm] OK [I'm] gonna walk' he said 'alright' then I left at 7:30."

### D. Jane's September 5, 2012 Statement

On September 5, 2012 Jane was interviewed at the Children's Interview Center in San Pablo by a forensic interviewer. District Attorney Senior Inspector Robert Pamplona, formerly a San Pablo police officer, listened to the entire interview from behind a two-way mirror. He recalled Jane described three specific hugs her uncle gave her.

### DISCUSSION

Defendant argues the evidence supporting a fourth count of lewd conduct on August 15, 2012 is insufficient because Jane testified to three hugs only, she gave a statement on September 5, 2012 describing three hugs only, and in her prior oral and written statements to Officer Casalnuovo, she never described the fourth hug "in any

detail or with any particularity." Such evidence, he posits, cannot qualify as substantial evidence that is "reasonable, credible and of solid value." (*People v. Johnson* (1980) 26 Cal.3d 557, 578.) We disagree.

In reviewing a claim of insufficiency of the evidence on appeal, " 'the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (*People v. Johnson, supra,* 26 Cal.3d at p. 576, quoting *Jackson v. Virginia* (1979) 443 U.S. 307, 318–319.) "This court must view the evidence in a light most favorable to respondent and presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. [Citation.] If the circumstances reasonably justify the trial court's findings, reversal is not warranted merely because the circumstances might also be reasonably reconciled with a contrary finding. [Citations.]" (*People v. Redmond* (1969) 71 Cal.2d 745, 755; *People v. Clark* (2011) 52 Cal.4th 856, 945; see *People v. Jackson* (2014) 58 Cal.4th 724, 749.)

" 'Although we must ensure the evidence is reasonable, credible, and of solid value, nonetheless it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts on which that determination depends. [Citation.] Thus, if the verdict is supported by substantial evidence, we must accord due deference to the trier of fact and not substitute our evaluation of a witness's credibility for that of the fact finder. [Citations.]' [Citation.]" (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206.)

In this case the jury was called upon to decide whether defendant had given Jane no lewd hugs, three lewd hugs, or four. All of her prior inconsistent statements were admitted into evidence for the jury's consideration. On the day the hugs were given, Jane clearly described four hugs orally and in writing. The first one occurred after she left the bathroom and entered her room to put on her socks and shoes. The second occurred after she put on her socks and he hugged her "on the other side of the bedroom." The third occurred after he went to the bathroom and she went to get her coat. Finally, the fourth occurred when she went back into her room to get her backpack. It is true not all the

6

hugs were described in lewd detail. However, the jury was entitled to infer from the fact of defendant's prior indecent exposure to Jane during car rides, the thrusting motion accompanying at least one of the hugs, the stick-like feel of defendant's private parts, that all of the hugs were accomplished with a lewd intent. In addition, Jane's prompt report to school officials may have enhanced the credibility of her same-day statements. A rational jury could conclude from all of these facts that Jane's memory of the events was freshest on the day the hugs occurred, and that her memory of events had receded somewhat with the passage of time when she testified a year later. If believed by the jury, Jane's prior inconsistent statements recounting four lewd hugs were admissible to prove four lewd hugs occurred.[4] (Evid. Code, § 1235.) Substantial evidence supports the jury's findings of four lewd acts.

**The Trial Court's Imposition of Consecutive Life Terms for Counts One Through Four Was Not an Abuse of Discretion.**

Defendant was sentenced to three consecutive 25-year-to-life terms for counts one through three, and one consecutive 75-year-to-life term for count four, for a total consecutive sentence of 150 years to life. Defendant argues it was an abuse of discretion to impose consecutive sentences in this case. We disagree.

In this case, consecutive sentences were permissive, not mandatory, under former section 1170.12, subdivisions (a)(6) and (a)(7).[5] Under those subdivisions of the Three

---

[4]  The jury was instructed it could use statements made by a witness before trial to evaluate the believability of the witness and "[a]s evidence that the information in (that/those) earlier statement[s] is true." (CALCRIM No. 318)

[5]  At the time defendant committed the offenses of which he was later convicted, section 1170.12 provided in relevant part: "(a) Notwithstanding any other provision of law, if a defendant has been convicted of a felony and it has been pled and proved that the defendant has one or more prior felony convictions, as defined in subdivision (b), the court shall adhere to each of the following:

[¶] . . . [¶]

"(6) If there is a current conviction for more than one felony count not committed on the same occasion, and not arising from the same set of operative facts, the court shall sentence the defendant consecutively on each count pursuant to this section.

7

Strikes law, the court must impose a consecutive offense for each current offense *not* committed on the same occasion, *and not* arising from the same set of operative facts. By implication, this means if the current offenses *were* committed on the same occasion *or did* arise out of the same set of operative facts, the court has discretion to impose concurrent or consecutive sentences. (*People v. Lawrence* (2000) 24 Cal.4th 219, 223, fn. 2; *People v. Hendrix* (1997) 16 Cal.4th 508, 512–513; *People v. Hall* (1998) 67 Cal.App.4th 128, 137–139.)

The trial court recognized as much, stating, "I understand that I have discretion to impose a concurrent sentence, and the law is clear that I do." The court exercised that discretion to impose consecutive sentences, deeming them more "appropriate based on the facts that we heard at trial."

The phrase " 'committed on the same occasion' " means "at least a close temporal and spatial proximity between the acts underlying the current convictions." (*People v. Deloza* (1998) 18 Cal.4th 585, 595, 599.) The phrase " 'arising from the same set of operative facts' " means "sharing common acts or criminal conduct that serves to establish the elements of the current felony offenses of which defendant stands convicted." (*People v. Lawrence, supra*, 24 Cal.4th at p. 233.) Defendant first argues

---

"(7) If there is a current conviction for more than one serious or violent felony as described in paragraph 6 of this subdivision, the court shall impose the sentence for each conviction consecutive to the sentence for any other conviction for which the defendant may be consecutively sentenced in the manner prescribed by law."

"(b) Notwithstanding any other provision of law and for the purposes of this section, a prior conviction of a felony shall be defined as:

"(1) Any offense defined in subdivision (c) of Section 667.5 as a violent felony or any offense defined in subdivision (c) of Section 1192.7 as a serious felony in this state." (§ 1170.12, added by Initiative Measure (Prop. 184, § 1, approved Nov. 8, 1994; eff. to Nov. 6, 2012.)

A lewd and lascivious act on a child under 14 in violation of section 288, subdivision (a), is both a violent felony under section 667.5, subdivision (c)(6) and a serious felony under section 1192.7, subdivision (c)(6).

that "[i]n concluding it retained discretion to impose concurrent terms, the court impliedly determined the four hugs were committed on the same occasion and arose from the same set of operative facts." From this premise, defendant appears to argue that having made the initial "same occasion/same set of operative facts" determination, the trial court was compelled to impose concurrent sentences. We disagree.

In order to determine whether it has the discretion to choose between consecutive or concurrent sentences under former section 1170.12, subdivisions (a)(6) and (a)(7), a trial court must make a preliminary determination whether multiple current felony convictions were committed "on the same occasion" *or* "arose 'from the same set of operative facts.' " (*People v. Hall, supra*, 67 Cal.App.4th at pp. 137–139.) The threshold determination that one or the other circumstance exists then allows the trial court to sentence the defendant *either* concurrently or consecutively. (*Hendrix, supra*, 16 Cal.4th at p. 514; *People v. Deloza, supra*, 18 Cal.4th at p. 596.) It does not mandate concurrent sentences.

We review the trial court's decision to impose consecutive sentences for abuse of discretion. Under that standard " 'a "trial court's ruling will not be disturbed, and reversal of the judgment is not required, unless the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." ' [Citation.]" (*People v. Jones* (2013) 57 Cal.4th 899, 924.) Defendant argues the consecutive sentences were patently absurd and a manifest miscarriage of justice because defendant's conduct was not that serious: the hugs were close in time, both defendant and Jane were fully clothed, there was no skin-to-skin contact or penetration, and no use of force, violence, duress or fear of bodily injury. These facts were apparent to the trial court and, we presume, duly considered. Defendant does not argue otherwise.

In making the decision whether to impose concurrent or consecutive sentences, "the trial court is guided by the criteria set forth in California Rules of Court, rule 425

9

[now 4.425]. Rule [4.425] provides: [¶] 'Criteria affecting the decision to impose consecutive rather than concurrent sentences include: [¶] (a) [Criteria relating to crimes] Facts relating to the crimes, including whether or not: [¶] (1) The crimes and their objectives were predominantly independent of each other. [¶] (2) The crimes involved separate acts of violence or threats of violence. [¶] (3) The crimes were committed at different times or separate places, rather than being committed so closely in time and place as to indicate a single period of aberrant behavior. [¶] (b) [Other criteria and limitations] Any circumstances in aggravation or mitigation may be considered in deciding whether to impose consecutive rather than concurrent sentences, except (i) a fact used to impose the upper term, (ii) a fact used to otherwise enhance the defendant's prison sentence, and (iii) a fact that is an element of the crime shall not be used to impose consecutive sentences.' " (*People v. Deloza, supra*, 18 Cal.4th at p. 596, fn. 8.)

In this case, the court stated its reasons for choosing consecutive sentences as follows: "I don't find that in this case . . . Counts 1 through 4 arose out of the same set of circumstances. I think Mr. Watson made choices during that evening [*sic*]. He left the room several times, returned. And even though it is the same victim, there are different acts against that victim even though it's the same location. [¶] . . . [¶] But as to the concurrent versus consecutive issue, I think that the consecutive sentence is appropriate based on the facts that we heard at trial."

The trial court's stated reasons fall within the parameters of the Rules of Court, rule 4.425. The trial court found each act separate and distinct from the others such that defendant had the opportunity to choose to persist or desist in his conduct. "[T]he fact that defendant had time to reflect between the [acts] was relevant in determining whether to impose a consecutive or concurrent term because having time to reflect may reasonably be considered an aggravating factor." (*People v. Coelho* (2001) 89 Cal.App.4th 861, 887.) In addition, defendant had a long criminal history that

10

included both violent and serious felonies and indecent exposure at school yards.  We cannot say the trial court abused its discretion in imposing consecutive sentences.

## CONCLUSION

The judgment is affirmed.

_____
DONDERO, J.

We concur:


_____
MARGULIES, Acting P. J.


_____
BANKE, J.

12

A140044